IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| UNITED STATES OF AMERICA | Criminal Action No. |
|---|---|
| v. | 1:24-CR-400-SEG |
| KIMBERLY JOHNSON | |

### Government's Sentencing Memorandum
### For Kimberly Johnson

The United States of America, by Richard S. Moultrie, Jr., Acting United States Attorney, and Alison B. Prout, Assistant United States Attorney for the Northern District of Georgia, files this Memorandum in preparation for the sentencing of Defendant Kimberly Johnson ("Defendant"), and recommends a low-end guidelines sentence of 30 months.

## I. PROCEDURAL BACKGROUND

On December 13, 2024, Defendant Kimberly Johnson was charged by information with conspiracy to commit mortgage fraud in violation of 18 U.S.C. §§ 371 and 1343 relating to a scheme designed to enable unqualified homebuyers to obtain home mortgages. (Doc. 1). On January 8, 2025, the Defendant entered a negotiated guilty plea to the information. (Doc. 9).

Two legal issues are in dispute. First, the parties dispute the applicable loss amount. The parties agree that the total loss amount is greater than $1.5 million but less than $3.5 million, (Doc. 9-1 ¶ 13(c)), but disagree as the specific amount within that range. This dispute does not impact the appropriate loss guideline enhancement, on which the parties agree. (*Id.*) Second, the Defendant objects to not receiving a mitigating role adjustment pursuant to U.S.S.G. § 3B1.2. For the

reasons set forth below, the Court should follow the recommendations of the Probation Officer, which align with the Government, as to both issues.

Additionally, for the reasons discussed below, the Government recommends that the Defendant receive a sentence at the low end of the guidelines range, which is warranted by the relevant factors of 18 U.S.C. § 3553(a).

## II. FACTUAL BACKGROUND

For more than three years, the Defendant participated in a mortgage fraud conspiracy. (Doc. 1 ¶¶ 1-3). The conspiracy enabled hundreds of unqualified homebuyers to obtain home mortgages by fabricating employment and salary information in loan applications and bolstering that information with falsified bank records and earnings statements. (PSR ¶ 14). The object of the conspiracy was to grease the wheels of the mortgage approval process so that the participating loan officers could earn fees for the loans they originated.

The Defendant's role in the conspiracy was critical. She generated the falsified documents used to support the fraudulent loan applications. (PSR ¶ 11). This included payroll check stubs, bank statements, IRS Forms W-2 and any other information required by the lenders. (*Id.* ¶ 13). The Defendant sent and received thousands of emails during the conspiracy period that included explicit talk about exactly how to falsify the documents and how to avoid detection. For instance, a co-conspirator directed her to "Make sure numbers at [sic] up" and "USE PAYSTUB THAT HAS NEVER BEEN USED." (*Id.* ¶¶ 16-17). Between August 2019 and January 2023, the Defendant assisted in the successful submission of a staggering 450 mortgage loans worth approximately $161 million. (*Id.* ¶ 9).

The motivation for this scheme was to generate mortgage broker fees. When a new mortgage was underwritten and approved, the originating mortgage broker

would earn a fee. If the loan was not approved, no fee was paid. Because of the Defendant's extensive document fabrication efforts, originating lenders paid hundreds of thousands of dollars in mortgage broker fees that they otherwise would have avoided. Of that sum, at least $566,000 in fees was paid to a loan officer, Albert Oluwole, who personally originated many of the fraudulent loans. Doc. 9-1. ¶ 14.[1] For years, Oluwole told the Defendant what information to put into the falsified bank statements, pay stubs and W-2s, and the Defendant provided the requested documents.

In exchange, Oluwole kicked back thousands of dollars to the Defendant. Square Cash and Zelle records from a portion of the conspiracy period reflect that Johnson received at least $220,000 in payments from Oluwole as compensation for her role in the scheme. (PSR ¶ 19a). Importantly, although the conspiracy period lasted from at least August 2019 until at least January 2023, the financial records obtained only cover April 2019 through March 2021. (*Id.*). Therefore, it is possible that the actual amounts that Oluwole paid to the Defendant could be as much as double that amount, or more.

One consequence of helping unqualified borrowers obtain mortgages is that those borrowers often default. At least 52 of the 450 loans that the Defendant helped to procure have already gone through the loss mitigation process, resulting in lenders writing down $1,748,066 from those mortgages. (PSR ¶ 21; Doc. 9-1 ¶ 14). HUD has compensated the lenders for those losses, resulting in a $1,748,066 loss to HUD. The parties agree that HUD is entitled to restitution in this amount. (PSR ¶ 24; Doc. 9-1 ¶ 20).

---

[1] Oluwole is now deceased.

### III. DISPUTED LEGAL ISSUES

#### A. The Ill-Gotten Mortgage Broker Fees Should Be Included in Loss.

Under the Guidelines, financial losses are determined by using "the greater of actual loss or intended loss." § 2B1.1(b)(1)(A). The Guidelines define "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense." USSG 2B1.1(b)(1)(C). Here, actual loss is comprised of two separate components: (1) mortgage loan write-downs; and (2) mortgage origination fees paid to brokers for the fraudulent mortgages. As explained below, the parties agree to the first component, both as to its amount and as it its inclusion in actual loss. Regarding the second component, the parties agree to its amount but disagree about whether it should be included in actual loss. Both components are explained below.

##### 1. Mortgage Loan Write-Downs

The Guidelines Commentary explains that in a case involving loans with collateral, like home mortgages, the value of the collateral (determined by either its resale value or market value) should offset the amount of loss. USSG § 2B1.1 comment. n.3(D)(ii) & (iii). The idea behind this Commentary is that when a lender extends a loan based on fraudulent information and the borrower eventually defaults, the lender can recuperate some of its loss on a defaulted loan by selling the collateral. This Commentary, therefore, is applicable when a lender forecloses on a loan and sells of the property.

Here, this calculus did not apply because instead of fully defaulting delinquent buyers and foreclosing on their homes, lenders have made efforts to help buyers avoid foreclosure by writing down portions of many mortgages, thereby reducing the borrowers' debt burden. In other words, lenders have attempted to mitigate their losses by reducing the borrowers' debt burden. Consequently, these lenders will never be able to recover the full amounts of funds they lent to buyers. *See United States v. Persac*, 493 F. App'x 558, 561-62 (5th Cir. 2012) (noting that no credit related to value of collateral should be given when portions of the principal balance were forgiven by lender). For example, if a lender issued a $200,000 mortgage to a borrower but the borrower missed multiple mortgage payments (likely because the borrower was unqualified for the mortgage in the first place), the lender might have reduced the borrower's debt to $150,000 to make it more likely for the borrower to resume making payments. The lender presumably would prefer this outcome to the expense and uncertainty of foreclosure, but the lender has still suffered a loss of $50,000, even in the best-case scenario where the borrower makes all remaining payments. Here, as of the time that the Defendant agreed to enter her plea, 52 out of the 450 loans had experienced defaults leading to write-downs in an amount totaling $1,748,066, and the parties agree that the loss amount is at least this much. (Doc. 9-1 ¶ 14). This is undisputed.

Had property values fallen instead of risen during the conspiracy period, the loss suffered by the lenders could have been many multiples higher. And given that most of these home loans have 30-year terms, significant additional losses may occur in the future. Although the conspiracy resulted in the issuance of 450 fraudulent home loans, the Defendant has only been held accountable for the 52 loans that have *already* fallen into substantial enough delinquent status to result in a write-down.

### 2. Mortgage Broker Fees

Before a lender agrees to issue a mortgage, the borrower most go through the underwriting process. Mortgage brokers assist in this process by collecting the necessary documents and evaluating the risk of each prospective borrower. To incentivize mortgage brokers to identify credit-worthy borrowers and originate loans, the brokers may be paid an origination fee. The conspiracy was built around helping unqualified home buyers obtain mortgages to rake in that origination fee.

This conspiracy involved the origination of mortgage loans through many different originating lenders.[2] Of the 450 loans for which the Defendant helped fabricate documents, 69 of those loans resulted in the payment of a mortgage broker fee to the Defendant's co-conspirator, Albert Oluwole. Although many of the remainder of the 450 loans also generated origination fees, because the Government only had evidence that co-conspirator Oluwole directed the Defendant and paid her kickbacks, the Government only seeks to add those payments made directly to Oluwole to the total loss, totaling approximately $566,000.

The brokers' fees are a separate expense from the loss of principal incurred due to the loan write-downs. There is support for the Court to include both components in its actual loss computation. *See, e.g.*, *United States v. Lopes*, 705 F. App'x 855 (11th Cir. 2017) (in real estate fraud case, affirming district court's inclusion of both lost principal and out-of-pocket costs including broker's fees in loss). These fees were obviously foreseeable to the conspiracy participants since they were very reason for the conspiracy, and the Defendant herself shared in a large portion of the fees. They should be included in the actual loss amount and restitution award.

### B. Defendant is not entitled to a minor role reduction.

The Defendant, as the proponent of the downward adjustment under Section 3B1.2, bears the burden of proving her mitigating role in the offense by a preponderance of the evidence. *United States v. Martin*, 803 F.3d 581, 591 (11th Cir. 2015) (citing *United States v. Alvarez-Coria,* 447 F.3d 1340, 1343 (11th Cir. 2006)). Whether a defendant is entitled to a minor role reduction is "based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case." *United States v. Presendieu*, 880 F.3d 1228, 1249 (11th Cir. 2018) (citing U.S.S.G § 3B1.2(b) comment. n.3(C)).

The Sentencing Guidelines contain a non-exhaustive list of factors to be considered, including (1) "the degree to which the defendant understood the scope and structure of the criminal activity;" (2) "the degree to which the defendant participated in planning or organizing the criminal activity;" (3) ""the degree to which the defendant exercised decision-making authority or influenced

---

[2] Originating lenders often later sell their mortgages to other lenders, either in bundles or individually. Therefore, the originating lender might not be the lender who suffers the loss associated with the loan write-down.

7

the exercise of decision-making authority;" (4) "the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;" and (5) "the degree to which the defendant stood to benefit from the criminal activity." U.S.S.G. § 3B1.2 cmt. 3(C) (2015); *see also United States v. Presendieu*, 880 F.3d 1228, 1249-50 (11th Cir. 2018).

A defendant is not entitled to a mitigating role reduction solely on the basis that another defendant is more culpable. Even the least culpable defendant in a conspiracy does not necessarily qualify for a role reduction. *See United States v. Zaccardi*, 924 F.2d 201, 203 (11th Cir. 1991) (rejecting a test that "would require sentencing courts to regard the least culpable member of any conspiracy as a minor participant, regardless of the extent of that member's participation."); *United States v. Uribe-Redondo*, 238 F. App'x 597, 598 (11th Cir. 2007) ("Even if a defendant can show that his role was less than that of other participants, this may not be dispositive of role in the offense, since it is possible that none are minor or minimal participants.").

The Defendant's conduct does not qualify for minor role under the factors set forth in the Sentencing Guidelines for four reasons. First and foremost, the nature and extent of the Defendant's participation in the conspiracy are vast. She actively participated in the conspiracy for approximately three and a half years. During that time, she sent and received thousands of emails furthering the scheme, prepared well over one thousand fake documents, and facilitated the approval of 450 loans.

Second, the Defendant's extensive email correspondence makes clear that she had an understanding of the scope and mechanics of the criminal activity. She understood how to change documents to avoid detection, she knew that certain

8

names and numbers had to match perfectly, and she knew that she had to conceal her co-conspirator's name in the fabricated materials. She also understood that her efforts were generating fees since she received at least kickbacks for the part she played. Defendant had to understand that her actions were generating substantial amounts of ill-gotten gains.

Third, the Defendant benefited substantially from the criminal activity. The investigation revealed that she received at least $220,000 in kickbacks from Oluwole, out of the $566,000 that he received. This amounts to almost 40% of the proceeds of the fraud. Because the Government's records only cover a portion of the conspiracy period, it is likely that the Defendant and her co-conspirators earned much more.

Fourth, the Defendant was only held accountable for the loans in which she was directly involved. And as to those loans, her role was central. Banks relied on the documents she fabricated to approve the mortgages. Even though the investigation showed that Oluwole worked with others, and that loan officers other than Oluwole were involved, only loans tied directly to the Defendant have been attributed to her. For all of these reasons, the Defendant cannot meet her burden to show that she should receive a mitigating role reduction.

## IV. THE SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a) SUPPORT A GUIDELINES SENTENCE

The district court should begin all sentencing proceedings by correctly calculating the advisory Guidelines range. *Gall v. United States*, 522 U.S. 38, (2007). While the Guidelines are significant factors in the Court's sentencing decision, the Court must ultimately determine a reasonable sentence based on the factors set forth in 18 U.S.C. § 3553(a). *United States v. Pugh*, 515 F.3d 1179, 1188 (11th Cir. 2008).

Congress provided, through 18 U.S.C. § 3553(a), the factors to be considered

by district courts in imposing a "sentence sufficient, but not greater than necessary, to comply with" the basic aims of sentencing, which include (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need for the sentence to reflect the seriousness of the offense and to promote respect for the law; (3) the need for adequate deterrence; (4) the need to protect the public; (5) the need to provide the defendant with educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Guidelines range; (8) the pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to victims. 18 U.S.C. § 3553(a)(1)-(7). The Government will discuss the most relevant factors at sentencing, but the Government submits that the Section 3553 factors as a whole warrant a guidelines sentence at the low end.

### A. The Seriousness of the Offense

Mortgage fraud not only impacts the individual lenders left holding the bad mortgages, but all of the government agencies that insure the loans (and thus, taxpayers), as well as the neighborhoods with homes that go into foreclosure. It also impacts the integrity and security of our financial markets and has the potential to impact the American economy, as the mortgage crisis of 2008 demonstrated. A wide-spread mortgage fraud scheme like this must be taken seriously. History has shown that often these schemes are not fully unmasked until a downturn in the property market, at which point many more unqualified home buyers are likely to default on their mortgages.

## B. The Need for Adequate Deterrence

The need for both general and specific deterrence warrants a guidelines sentence in this case. The Defendant's multi-year participation in this scheme was not a one-time lapse in judgment. Rather, it was a series of hundreds or even thousands of choices to continue to engage in flagrant acts of deception to make money. Thus, even though the Defendant has no prior criminal history, she has shown a willingness to repeatedly choose criminal conduct. Moreover, although much of the conspiracy took place during the Covid pandemic when many people were struggling economically, the Defendant entered the conspiracy before Covid started, and continued well past its time.

General deterrence is equally important here. Experience has shown that crimes like mortgage fraud tend to occur in waves as criminal actors find success. The sheer similarity of mortgage fraud schemes indicates that mortgage fraudsters learn from one another and from word-of-mouth and overall lax practices in the industry. Imposing a substantial sentence sends a message that the criminal justice system takes this type of fraud scheme seriously.

**[CONTINUED ON NEXT PAGE]**

## Conclusion

For the foregoing reasons, the Government respectfully requests that the Court sentence the Defendant to a low-end guidelines sentence. Such a sentence is sufficient, but not greater than necessary to comply with considerations of 18 U.S.C. § 3553.

April 4, 2025

Respectfully submitted,

RICHARD S. MOULTRIE, JR.
   *Acting United States Attorney*

/s/ ALISON B. PROUT
   *Assistant United States Attorney*
Georgia Bar No. 141666
600 U.S. Courthouse
75 Ted Turner Drive, SW
Atlanta, GA 30303
404-581-6105; Fax: 404-581-6181